May it please the Court, my name is David Abney. I'm here representing the plaintiff's appellants in this matter. I was here yesterday and I had a great time. I hope I do better today. Hard to do better than you did yesterday. Yeah. We had to talk about trucks yesterday, so. Thank you, Your Honor. I fear we're going to have a flinch rule as a result of this case. That if police officers have a suspect who has a weapon nearby and he appears to be mentally disturbed and he's uncooperative, if you can get the suspect to flinch, you can start firing. And I don't think that's a good rule to have. Before we get to that, would you please give your client's perspective on what the officers saw when they first approached this? What, if anything, did they know about Mr. Garcia? How did the car appear? What did they know anything about his mental state? I'd like to know your perspective on that first, because, of course, what they did ultimately depended on what they saw and understood. So would you please give the Court your perspective on what the officers saw when they first approached the vehicle? I'll try, Your Honor. When they approached the vehicle, they saw a vehicle with the engine running. It had tinted windows. Could you speak up, please? When they first got there, they saw a gentleman in a car with the engine running, and it was stationary. And where was this? Was it day? Was it night? What were we talking about? During the day, bright daylight. The windows were heavily tinted. They didn't know anything about him or about the vehicle. They went up and tried to get information from him and to use... Did they know whether he had allegedly committed any serious crimes, that he was wanted for anything? They had no information. What did they know about Mr. Davis at that point? No information about any serious crime that he had committed. What he was being was, it proved to be, uncooperative. He was, to use the phrase, gaslighting them. He was making up some names about who he was, and he just didn't want to cooperate. And so it escalated after that. Eventually, the police officers, they bracketed him, three of the officers. They had their weapons either out or, well, I guess all three toward the end had their weapons out, pointed at him. He wasn't doing anything other than being uncooperative. And what time of day was this, please? It was, I believe it was around midday, if I recall correctly. They did know something, and I don't think this is contested. They knew there was a gun in the car. Yes, Your Honor. Because, and it was either, when they first looked, either in the console or between the console and the driver's seat, correct? Yes, Your Honor. And the officer, I think it's Officer Wilson, but sometimes I may have him confused with the other officer, at some point says, he's got a gun, he's holding a gun. And we know that after the incident, the gun is found in Mr. Garcia's lap. Yes, Your Honor. And we know as well that the Officer Wilson said repeatedly, he didn't say drop, he said drop the gun once, but in his deposition, he said that his hand was on the gun. And he said specifically, he wasn't pointing it, but his hand was on the gun. And he thought of points that he raised, but he kept saying it during the incident, drop the gun, get your hand off the gun. So, isn't that some fairly persuasive evidence that when there's nothing to the contrary, that at least he thought his hand was on the gun? Well, based on the videos that the district court reviewed, the district court didn't come up with that conclusion at all. Well, we reviewed this.  Go ahead, I'm sorry. Judge Rizzo. The district court said he couldn't see it, but that's not evidence. He couldn't tell anything from the videos. The best he could tell from the video was there's a question of fact whether he was indeed holding the gun, had his hand on the gun, or was doing anything in particular with the gun. There's a question of fact because you can't tell. Yes. And I think it's the easiest thing in the world for a police officer to say, drop the gun, drop the gun, when he doesn't even have the gun in his hand. But why would he say it repeatedly, repeatedly, repeatedly, and the other person said it repeatedly, repeatedly, repeatedly, and when Mr. Garcia didn't say, I don't have a gun or I don't have my hand on a gun, he said, shoot me. So that's some corroboration, at least, that he actually had his hand on the gun. So why? It's a hard situation because I don't think this resolves the case. Because as you say, ultimately the question is, did he raise the gun? Was he pointing it at anybody and was there a threat? But as to whether he had his hand on the gun, it seems the evidence is completely one-sided, isn't it? I don't think so. Or whether they thought he had his hand on the gun. Right. They may have thought that. The district court didn't think that. The district court, as I recall from my notes, said that Mr. Garcia did not grab, lift, or  But those are not findings of fact, Mr. Abney. Those are findings by the district court that there's not a dispute of material or that there is a dispute of material.  And we review that de novo. Well, yes. So I still want to focus on the gun for a second. We know where it started and we know where it ended up. Right. So and the officer says he's got his hand on the gun or words to that effect. We know from where it ended up that that's more likely true than not, don't we? It didn't, the gun didn't transport itself from its original position into Mr. Garcia's lap. He must have held the gun at some point during the confrontation, correct? No. How then did it end up on his lap when it was originally in the console? The car wasn't turned over. Some involuntary body movements after being shot. He could have dislodged the gun wherever it was. Well, he could have. It could have wound up in his lap. He could have. But we're now trying to figure out what the officer's reasonably perceived. And that's a question of fact, really. You can't, the district court can't really resolve that. All the district court can say, based upon what I see, he did not grab it. He did not aim it. He did not point it. He didn't do anything with it. What happened was, which brought us into the quality of the video. The problem is that, you know, in this world of videotapes, you think the video is going to prove, going to resolve the question. That doesn't eliminate all the other evidence. No, it doesn't. It becomes part of the mix, and an important part of the mix. I think the reason that people today are so thoroughly dissatisfied with police responses is the video camera. Now, in the past, the police officers would give a one-sided view, especially when the suspect is dead, about what happened. Oh, he grabbed a gun. I felt a threat to myself. I felt a threat to the public. And then you get these videos. But what's different about this case is that it wasn't retrospective. He was saying all this at the time, emphatically, and over and over again. And why would he be doing that if he didn't at least think it? I mean, and then the question becomes, did he reasonably think it? Your Honor, that's the craziest thing in the world for a police officer to do. And I've seen videos, and I'm sorry I don't have any of them with me, but I've seen news reports and videos of police officers taking suspects down and yelling over and over, drop the gun, drop the gun. And there's no gun anywhere in the vicinity. Here there was. In this case, there was. But was it in his hand? So let me ask you, suppose I thought that the officer, Wilson, at least reasonably did think there was a gun and reasonably thought that his hand was on the gun. Then what? He didn't. Wilson didn't think at that point that he was pointing the gun or threatening him with the gun. He specifically said that in his deposition. So don't you end up in the same place given our case law? I mean, is there. How does the excessive force analysis and the clearly established law analysis go? If there was a gun, his hand was on it, but he wasn't pointing it at anybody. And then this thing happens with the window. And as you say, he flinches. Then what? I cited and discussed at least four cases from this court discussing situations where people are holding weapons or they're right next to weapons and police officers start shooting. But it's found that they don't have qualified immunity because there was no immediate threat to themselves or to the public. And here there was no immediate threat. On that very point, because out of all the cases that you cite to support your argument that there's clearly established law that the officers violated the Fourth Amendment, what single case is your strongest in your perspective? Holy smokes. I actually cite a bunch. What's your strongest? I think Cruz versus city of Anaheim, where the gun was in a waistband and the police officers decided my difficulty. And I'm I'm start from the premise that and it may or may not be correct that Judge Liberty correctly found there was a constitutional violation here. Yes, Your Honor. So now I'm trying to figure out whether or not this meets the second part of the qualified immunity test that the Supreme Court has forced us to try to parse. And the court keeps telling us every time that we find that the second part's met. No, no. Don't reason from general principles. Look at the facts of the case and see if there's another case where the facts are close. And so I'm trying to figure out whether the facts that you related to Judge Smith at the beginning, a mentally disturbed individual who had apparently refused to come out of the car, refused, refused what I think are plainly lawful orders to get out of the car because you're parked in somebody else's driveway in a crime scene, rolls up the window, refuses to talk and plainly has a gun within reach in the car. Whatever else you believe or don't believe. Give me a case that gets a Ninth Circuit, a Supreme Court case that gets close to that set of facts. I personally don't think we should have to go through that exercise, but people in Washington keep reminding me we have to. So I cannot give you a flinch case. I got to tell you, as the author of the Lopez case, the Supreme Court took 12 conferences to resolve that case because they had to focus so much on the details. And that's what we're struggling with here. I mean, it's we need details and I want to get your best case in this case. Yeah, I think I have no best case. I have the four cases, Cruz, Morris, Lopez and Curnow. And I think they're all good because they all involve people either holding weapons or be right next. Oh, no. And Cruz, they didn't even know he had a gun. So that's not very helpful. Cruz had no weapon. They had a gun in the waistband. He knew he reached for his waistband. Oh, they thought he had a gun in the waistband. And they had no basis for thinking that he had a weapon other than the fact that he reached for his waistband. Here, we all agree the police knew that he had a weapon. But he didn't reach for it. He flinched. Well, let's let's put that aside for a second. We all we all know that he had a weapon. And so that makes it that makes Cruz difficult for me as a as a comparator. Well, the point of Cruz is that he could have had a weapon right there. And here, you know, he has a weapon, but he's still he's not reaching for it, which is what was happening in Cruz. And what was happening is other cases, the weapon was either right in hand or right next door. And the court said, no, this is not sufficient for qualified. Well, in the other cases, there was no warning to put down the weapon. And the court emphasized that our court emphasized that here there seemed to be repeated warnings to take your hands off the weapon and put your hands on the steering wheel, which he did. Well, there were his hands on the steering wheel when the officers broke the window. I don't know for sure. I think they were because I don't know for sure they were back. I mean, there doesn't seem to be expressed testimony about that. There was testimony. But the officer thought he had the gun. So he must think that his hands, if you have the gun, your hands can't be on the steering wheel. Can they? Well, no. But what I thought that the video actually showed those guys were on the gun, but I'm not sure about I mean, weren't on the steering wheel at that point. But I know I'm not positive about that. The thing that the problem is, and I like to reserve at least a minute, I'm coming down the wire here. The problem is you've got a situation where all you all you have to do as a police officer is to have a situation like this and then add in something that causes the suspect to flinch. Could be a bright light, could be a loud noise, could be smashing in a window, which is what the police officers did to instigate this whole last thing, which is the flinch. That's what makes this different from any other. I couldn't find any other case in the United States involving a flinch. And what's going to happen is what is the word flinch come from? In this case, by the way, nobody testified to flinch. I think the district court decided this. I know the district court characterized. I looked at the same video the court looked at. I think that's a good characterization. It may be an accurate characterization, but nobody testified to a flinch today. No, but that's what happened. I believe your time and you should say. OK, thank you. Let's hear from Mr. Wilson's counsel. May it please the court, Christina Retz on behalf of Wilson and Trevino. I think the court has highlighted the issue here, which is what would a reasonable officer on the scene have perceived, whether mistaken or not, about whether there was a gun in Mr. Garcia's hand? Can we separate you two? But that's not enough. I mean, under the case law, there are instances in which there were guns in people's hands and where nonetheless qualified immunity was denied because the gun was not being pointed or threatened or and so on. So I mean, I tend to think that there's enough evidence that they reasonably believe that there was a gun in his hand, but that's not sufficient. Well, in your honor, I would add to that and under the facts of this case specifically, where there were multiple commands that were disregarded. And the testimony that is uncontradicted by the officers is that he had the gun in his hand and raised it up toward Officer Dida at the time the decision was made to shoot. And why isn't that? I want to get back to my first question. But why isn't that a contested issue in this case? Because there is no evidence circumstantial or otherwise to support the hope that that is not the actual officer. Wilson testifies that the gun is in his hand after the window was broken. Correct. And Officer Trevino also testifies that the reason that he shot was that he saw his arm move up. Right. But that's a separate issue. He didn't. Officer Trevino didn't say I saw the gun in his arm. Correct. But he could, based upon the collective knowledge doctrine and the reason why I asked you to separate the two, because Mr. Abney didn't direct this, I suppose it doesn't make much of a difference. But Officer Trevino is standing behind someone who says, I see a gun. And, you know, my my rough sense is that under those circumstances, he's probably entitled, since he doesn't have as clear a view as the guy up front, to rely on what Officer Wilson says. So but I want to focus on Officer Wilson for a moment. Officer Wilson says, I saw a gun in his hand. Correct. And Officer Trevino doesn't say one way or the other. He just says his arm moved up. What's the evidence one way or another that he didn't have a gun in his hand? There is no evidence. The evidence that the court found without citation to any body camera, any witness testimony, any circumstantial evidence was that at one point the gun was in the console or between the console and the seat. We know that to be not true, because when you look at the three videos, Electronic Exhibits 9, 27 and 3, those are from Officer Baudway, who removed the gun from the lap. Those are from Officer Dida, who held and was continuing to state that the gun after the shooting was in the hand of Mr. Garcia. And you can see. Did he say it was in the hands or in the lap? Yeah, I have. We've all, I think, looked at the videos. I think the fairest thing to say from the videos is they don't help one way or the other because they're taken from outside a tinted window and they really don't show much of what's happening. So I'm trying to figure out what the testimony was with respect to Mr. Garcia and the gun after he was shot. After he was shot on the video, you can actually hear commands being given by Officer Dida and statements contemporaneously stating that the gun is in his hand. The gun is in his hand, in his lap, and that he has removed his hand off the gun. OK, that's what I mean. So you think the Officer Garcia, who's not a defendant in this case, said contemporaneously with opening, looking inside the car, the gun is in his hand and the gun is in his lap and his hand is on it. Yes. And in addition, we can physically look at the actual structure of the vehicle consistent with this court's decision in Gell House, in George v. Morris, in Cruz, where the court talks about circumstantially looking at all of the evidence to determine if there is any contradictory information. So here we know, based upon the physical structure, that the top of the console is closed. The gun cannot be in the, have been in the console. It would not have been visible. And it is closed. But the problem with that is your client testifies, Wilson, I believe, that when he, or somebody, when they first looked in, one of the police officers say, there's a gun in the console or between the console and the seat. So it was there at some point, correct? Correct. But we have where did the gun end up at the time? So where did we start? Where did we end up? This is the problem. There is, there are several cases in which George is one, for example. Where he was holding a gun, the victim was holding a gun and but but nonetheless, he wasn't aiming it at anyone. And the officers were not in time to qualify. So the question is, what negates that possibility here? The differing factual situations between in the call itself, between George and this call. So George is a case where you are in a person's home and the 911 call that was placed was from George's wife, who believes that he could be suicidal. So you're already starting with the point of a person who has not committed a crime, has not refused officer commands, is emotionally disturbed versus Mr. Garcia, where there was not such evidence. The police did not respond to the scene because of an emotional disturbance. They found him. And that all seems awfully flimsy in terms of a distinction. And what's the difference if he's in a car, in his car or in a house? I understand he was in a car, but they didn't even know that at that point that it wasn't his car. And what's the difference if it was his car or not his car? It was inside a car or it was inside a house. So what? The recognition under the Fourth Amendment that persons have a greater expectation, a reasonable expectation of privacy within their home. There's a very big difference here between the threat that was posed by Mr. Garcia having a gun in the location where he was directly in front of him. There were six people sitting on a pony wall in George versus Morris. The specific distinction made by the court was that Mr. Morris was alone. He was physically unable of holding the gun in a way that was threatening to the officers. In addition, his wife had been separated from him. So there was no risk that was posed to her. I would also... What about Lopez? They thought he was holding a gun, right? Turns out he wasn't, but they thought he was. And there are a lot of distinguishers in Lopez as well, specifically. And I would note that recently, very recently in Zorn versus Linton, the Supreme Court set forth two important principles that I believe are important to this case. That's 146 S.C.T. 926. The first is that the court distinguished in that case Amnesty International based upon warnings and said that there wasn't a clearly established case in that case because the court had used a prior case where there were no warnings given. So both in Gell House and also in Conroe cited by the plaintiff and also in Cruz, there were not warnings in all of the cases cited by the plaintiff. There were not warnings about what would happen and about the specific lethality of the force that would be used. Here we have a situation where there were multiple repeated warnings, starting with the command to keep his hands on the steering wheel, which would have negated this issue at all. Is your position, is your position that because he had, because that the officer was recently believed that he had his hand on a gun and that that's sufficient, and they gave him warnings and that's sufficient to make, to what, to make it not a constitutional violation or to abnegate any clearly established law? Or is your position that if everything turns on whether he actually did raise his hand at the end in a threatening manner or they could have thought so? Raising his hand, whether he has or making a movement, whether he has the gun or not, because in Amons versus Tinsdale, this court specifically talked about. And in many cases, this court has talked about making a furtive movement toward an object. Does the case turn on, what I'm asking you is, does the case turn on that, on the construction of what happened at the end, whether he raised his hand or in a way that they were entitled to think was threatening or not? Does the case turn on that? I don't believe the case turns on it because I believe that you have enough, given the facts, to not clearly establish the law under any of the precedents. We have an individual who's a prohibited possessor. There was reasonable suspicion. They didn't know that. But they had reasonable suspicion to believe that based upon the fact that he did not give his identity. He said that he had warrant. They didn't say anything about their opinion about whether he had to come legally or not. I would dispute that that's the proper inquiry because under Devin Peck versus Alford, the court says that that is an objective standard based upon what an objective officer would perceive based upon the facts. Objectively, not subjectively based upon what the officers said, it is undisputed that Mr. Garcia gave false information about his identity multiple times. He said he had a warrant. And putting that together, once you see a gun, the reasonable inference is you have a person who is a prohibited possessor who's not permitted to have a gun. Well, what does that have to do with the Fourth Amendment excessive force standard, whether he legally had the gun or didn't legally have the gun? Because it relates to the severity of the crime at issue. As we discussed in our papers, we believe the court started with the wrong place in contravention to Barnes versus Felix for determining what the crime was. We don't start at Mr. Garcia being in his vehicle only. We have to layer upon it the totality of the circumstances known to the officers. If you look at NAMPOC, the court talks about the fact that reaching toward a weapon, possessing a weapon in your hand can constitute an aggravated assault. The same with Ammons versus Tyndale, that there's a perception when there is even a reach or movement toward in this case. Now we put this layering of the commands that were disregarded, the contemporaneous statements that he had a gun, the officer's then perception. And we would submit that based upon the video that was enhanced, you can, in fact, see that he had the gun in his hand before this incident. I guess what troubles me is this. The original Pearson framework was designed to protect public officials who took actions that were not, were clearly not violations of the Constitution. On the other hand, you have members of the public. You've got some here. You have this young man who died and the officers have evidence in the cameras. We compare that evidence such as it is with other cases. And what troubles me is we seem to have irrigated to the courts a decision instead of to giving it to a jury, which we would normally do in actions like this, to make it the best possible determination. And I think there's a perception that somehow the police are being favored in the way this is being interpreted. I'm troubled by that. We want the system to be fair. We have this young man in the middle of the night. He's dead. He's dead. Now, did he do something that warranted that? Perhaps he did. But I'm troubled with the fact that we're not letting a jury decide this as opposed to three hopefully learned judges and learned counsel. What am I missing in this? Well, Your Honor, I would go back to what the Supreme Court just said in Zorn that in short, officers receive qualified immunity unless they could have read the relevant precedent beforehand and known that it prescribed their specific conduct. And the court in Zorn also cautioned using cases where the court has not determined that there's a constitutional violation to clearly establish the law. So we've talked about Gell House. We've talked about George. We've talked about Kern Row. But none of those cases actually found a constitutional violation. They remanded to the district court for that determination. And the facts are always a little bit different. And that's what troubles me, because in our system, if we let members of the public, jurors, make a balanced judgment, then that's the best we can do as human beings. But we want to have that opportunity, in my judgment, as the best way we can possibly proceed. Isn't that the way to go? Well, Your Honor, I would say this case represents a difference here, because unlike the other precedent, where there was contradictory statements by the officers, there was physical evidence that led the other way. Cruz, for example, he never had a firearm. The officers made up stories that were flatly untrue. He was caught up in his seat belt. If you look at all of these cases, you can point to specific facts where a jury could reasonably contend that the facts are not what was being advanced by the officers, by the body camera. That is not this case. The plaintiff concedes that there is no factual dispute in this case. The only said dispute is her hope that he did not have a firearm, which is contradicted by the body. Can I ask you a question about that? Yes. I know where the video is and I can look at it again. Tell me who testified that the gun was in Mr. Garcia's hand. Officer. Well, I have Officer Backus saying after so after Officer Deidre or whatever the name is, remove the gun from his hand. Officer Wilson, Your Honor. Officer Wilson. Yes. Testified that. And can you tell me where? In his declaration and the declaration. On a deposition, but it was very specific. No, Your Honor, it was not a deposition. He had given a walkthrough interview on the date of the incident. So the transcript is of his walkthrough on the date of the incident. Tell me, tell me, where was that in the E.R.? You don't have to find a precise. Because I missed that part of his declaration, if he did say it. Apologize, Your Honor. The declaration was pretty confused, as I recall. I have an interview with Officer Wilson. There is an interview that is. At E.R. At E.R. 1 S.E.R. 123. But there is also a declaration that goes along with that. If you can just. When he says it in his declaration is fairly confused or confusing. He says, when I looked back, I then saw that there was a handgun between the central control room and the E.R. And I started yelling at him to drop the gun. But there's no intermediate way where he says he has the gun and not pull it out, which he disregarded. I could see the slide portion of the gun in the sights. Then he says the gun was in his hand. So it's a rather confused statement. I do have Sergeant Backus in the interview saying. I did see it eventually when they pulled him out of the car. Officer Boudin or I think Officer Dida ended up grabbing the gun and putting it in his vehicle. So it was only. But that was after it was out of his hands and everything. They were pulling him out. So I'm trying to find somebody who actually said it was in his hands at 1 S.E.R. 90, 193 and 1 S.E.R. 194, 193 and 194.  And in paragraph 26, I can look it up. You don't need to read other questions by my colleagues in the interview. And this is what I thought was interesting. He said, I looked at and I see his hand was on it. And then he said, I kept giving him commands to let go of the gun. He raised the gun a little bit. He didn't raise it up and point it or anything, but it wasn't anymore sitting at his side. He lifted it up and I yelled at him, you know, you need to let go of that gun. And he said, if he raises that gun up anymore, I'm going to shoot him. So it is still true by that account and every other, as I understand it, that. When and then he says, and when he raised the gun up and they saw him flinch over and look over, I was afraid he was going to shoot the officer. But of course, if a bunch of glass comes flying at someone, you would expect him to move. Your Honor, I would point you to 1SER248, which is Wilson's statement. And I just want to be very clear on the decision you made to shoot. Was he had his gun out and raised? Yes. And that back window came out and that's when he raised the gun. But that to me is a different kind of evidence, because when Wilson is standing there shouting at him to drop the gun and does it repeatedly, I have every reason to think that he actually thinks he has the gun. Why else would he be doing this? What he's saying after the fact about whether he raised the gun or not is a different story. But you can also see that, Your Honor, within the vehicle of him moving. And then you can also use that circumstantially, as the court has done in George Gell House, with the other physical evidence to say, is that corroborated or is it not corroborated? The gun is. What corroborates the fact that he raised the gun in a threatening manner, as opposed to that he had his hand on the gun? Because the gun had to have been in his hand because his arm and I know that I said that I said that he had the gun. He was shot. He was shot through the right elbow. And mostly on the right hand side, which we had argued specific and it tends to happen in shootings that the officers tend to shoot at the location where the gun is being held because that is where they perceive the threat. Other questions by my colleague. Thank you for your argument. Mr. Abney, your wind up, sir. Police officers don't shoot at weapons. This isn't Audie Murphy shooting a gun out of a bad guy's hand. Police officers shoot at center mass. That's what they aim at. If they hit an arm, it's by accident because they're not shooting correctly. They're panicking. They're just unloading their weapons. That's what officers shoot at. They don't shoot at arms or elbows or weapons or anything else. You know, the point is, this last little bit here, everything that's leading up to it is unfortunate. The police officers pressed the situation, used profane, angry threats constantly and created this mess, but the point is, what happened right at the end? And it's the district court said that, no, there was no grabbing, lifting or aiming the gun at the police officer. And that's really what's important here. That's the point of all this. He said he didn't see it on the video. I don't know. But it may well be that there's no direct evidence or sufficient evidence that he raised his hand at that point because it was, there's obviously an alternative explanation. It may have come to them, which is a bunch of glass was falling on him. But at least up to that point, it was corroboration that he, in fact, had the gun in his hand. I don't think that's the end of the story, but up to there, it seems to me that the fact that it wasn't on the video isn't the answer. No, and it's not the end of the story. And as Judge Hurwitz said, this is going to be a de novo examination by this court and it's a tough call. But when it's a tough call and there's a constitutional rights involved here and people are dying, on the side of the Supreme Court building, we have this saying, where law ends, tyranny begins. And qualified immunity is the ending of law, I think. Well, the problem is that there's obviously. By my colleague. For the members of the audience, this is an area of the law that is probably among the most difficult for the public to understand. The Supreme Court has laid out a concept of qualified immunity. It is, in my judgment, without doubt, the most controversial element of criminal law. We do our best to interpret what the Supreme Court has told us. Whatever we decide, I assure you, we are empathetic to the loss of this young man. Nothing will bring him back. We will do our best to interpret the law as the Supreme Court has given it to us. But please understand, we know you care. We'll do our best. The case is argued and submitted. Thank you, Your Honor. Thank you, Your Honor.
judges: BERZON, SMITH, HURWITZ